Filed 9/19/14  In re A.S. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| In re A.S. et al., Persons Coming Under the Juvenile Court Law. | |
| NEVADA COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> APRIL S. et al., <br><br> Defendants and Appellants. | C075756 <br><br> (Super. Ct. Nos. J09207, J09208) |

Parents April S. (mother) and Chris S. (father) appeal from an order terminating their parental rights with respect to minors A.S. and Ashton S.  They contend the juvenile court erred:  (1) in finding A.S. to be adoptable; (2) in finding neither the parent-child relationship nor the sibling relationship exception applied to preclude the termination of parental rights; (3) in denying the parents' respective petitions for modification; (4) in denying mother's request for a bonding study; and (5) in failing to appoint separate

1

counsel for the children.  We conclude substantial evidence supports the court's finding of adoptability and inapplicability of the parent-child and sibling relationship exceptions to termination of parental rights; the court properly denied the parents' petitions for modification and mother's request for a bonding study; and there was no actual conflict between the children requiring appointment of separate counsel.  Accordingly, we affirm the juvenile court's orders terminating parental rights.

## FACTUAL AND PROCEDURAL BACKGROUND

The family had previous dependency court interactions in Wyoming in which A.S. (born 2003) was removed on two occasions (once for one year and once for one year and a half) due to the parents' methamphetamine use.  Ashton (born 2008) also had been detained briefly when mother was arrested for driving under the influence with him in the car.[1]  In the instant matter, the parents and the children were living in Nevada County at a homeless camp that lacked basic sanitation, clean water, and bathing facilities.  The parents were again using methamphetamine.  The family came to the attention of the Nevada County Department of Social Services (Department) when mother brought the two children, who were covered in bug bites, to the hospital.  Ashton was to be treated for a second-degree burn he had received from hot oil being spilled onto his head, neck, and thigh.  Hot oil spilled on Ashton when mother attempted to put out a fire on her camp stove while holding him.

The Department filed petitions alleging the minors came within the jurisdiction of the juvenile court pursuant to Welfare and Institutions Code section 300, subdivision (b).[2]  At the contested jurisdictional hearing, the juvenile court found the allegations in the

---

[1]    A.S. was 10 years old and Ashton was 5 years old when parental rights were terminated.

[2]    Undesignated statutory references are to the Welfare and Institutions Code.

jurisdictional petition to be true and sustained the petition.[3]  At the dispositional hearing, the juvenile court found clear and convincing evidence of circumstances justifying (1) the children's removal from their parents' custody, (2) reasonable efforts made to prevent the removal, and (3) the necessity of out-of-home placement.  The court also denied reunification services for both parents pursuant to section 361.5, subdivision (b)(13).  The children were placed in foster care together and the parents were awarded visitation.

In the Department's permanency planning assessment, prepared prior to the December 20, 2012, selection and implementation hearing, and updated on multiple occasions prior to the court's order terminating parental rights, neither child had any notable medical concerns.  However, both children had behavioral and developmental issues that evolved over the course of the dependency proceeding.

A.S. was "on target developmentally" but was receiving speech therapy, tutoring assistance, and individual and group counseling.  She had a speech impediment, was a year behind in reading, and engaged in attention-seeking behaviors when frustrated.  Additionally, A.S. had difficulty with "truth telling" and had made assumptions and threats against various foster parents based on her distorted view of events.  She apparently had been hospitalized in Wyoming for behavioral issues:  she was hurting herself and her brother, hitting and kicking her parents, could not be left unattended with the family dog "due to violence," constantly lied, was hard to control, and went into fits of rage.

Ashton was "primarily on target" but was initially referred for speech therapy.  The report noted his speech and social interactions had "improved greatly" while he was in foster care.  However, he had become a bit detached in the course of moving foster placements that were a result of A.S.'s behavior and her allegations against foster parents.

---

[3]     The court did not consider the family's Wyoming dependency history for purposes of the jurisdictional finding.

3

The Department recommended that if any further moves were required, it might be in Ashton's best interest that he remain in the current placement and that the siblings be separated. It was also noted Ashton was lively and interactive in A.S.'s absence, but quiet and reserved in her presence.

Based on the Department's assessment and recommendation at the December 20, 2012, selection and implementation hearing, the juvenile court found (1) there was clear and convincing evidence each child was likely to be adopted, (2) adoption was the permanent placement goal for each child, and (3) termination of parental rights would not be detrimental to them. However, the court did not terminate parental rights at that time as no adoptive parents had yet been found for the children. They were difficult to place as a sibling group and because of A.S.'s age.

In the subsequent addendums to the assessment, the Department indicated the current foster parents were interested in adopting Ashton but not A.S., and maintaining the sibling unit might not be in Ashton's best interest. The Department continued to recommend a permanent plan of adoption without termination of parental rights while it investigated potential relative placements. The June 20, 2013, report also noted concerns A.S. was displaying seductive behavior around males, and her other behavior was not improving despite the foster parents' efforts to correct it. She was demonstrating "bully like behavior" in the classroom and with Ashton, and was displaying "parentified" behaviors with Ashton and her peers. When they were in the same room, A.S.'s focus was to control Ashton, who would cease playing and "begin[] to shut down" in response. Despite the foster mother's attempts to redirect her, A.S.'s controlling behavior had not improved. A.S. reported she felt she did not have "a real mother" or belong anywhere.

After concluding it would be in the children's best interest to be separated, the Department was looking for an adoptive placement for A.S. where there were no younger children and few or no other children to give her "a sense of control and belonging." In mid-December 2013, the Department found a family interested in meeting with A.S. She

4

met the family, had a successful weekend visit with them, spoke with them daily, and was "excited" about the prospect of being with the adoptive family, who indicated they were prepared to adopt her. The Department's report also noted A.S. appeared to enjoy her visits with her parents, but she indicated she was prepared to have an adoptive family and she was "done" with her parents. Based on this report, as of January 10, 2014, the Department recommended adoption and termination of parental rights for A.S.

The addendum reports also reflected Ashton was "settled and comfortable" in his foster home where he had been placed for more than a year, and another move would be detrimental to his emotional health. He had become attached to the foster family, and had "become more social, smiles often, makes eye contact, and has gained self-confidence, particularly with his relationship with" A.S. Though, "when [A.S.] is in the room, Ashton is withdrawn, will not make eye contact and i[s] very quiet. Once she is out of the room, he brightens up and begins to interact with others." Ashton was noted likely to be adopted, and the current foster family was interested in adopting him only. The social worker felt it was in Ashton's best interest to remain with his current foster family, rather than experiencing multiple moves, as could be necessary were he to remain with A.S. The report also noted Ashton did not display any changes in behavior or talk about his parents after his visits with them.

At the January 27, 2014, continued section 366.26 hearing, the juvenile court found there was clear and convincing evidence the children were adoptable and would be adopted, found adoption was appropriate and served the best interests of each child, then terminated mother's and father's parental rights to both children. The court found the parents and children had a positive relationship in that there was no screaming, hollering, or demonstrated fear during their visits. However, there was no evidence the children turned to the parents to occupy a parental role or to provide guidance. The visits were fun, but the children had no trouble separating from their parents when the visits ended. The court further found the parents did not meet their burden of proof to demonstrate the

5

detriment of separating the siblings from each other or from the parents outweighed the benefit to the children that adoption offered.  At that hearing, an adoptions specialist testified A.S.'s parentification harmed Ashton, whose emotional growth and ability to form relationships could be stunted by A.S.'s behavior.  A.S. devoted her emotional energy to parenting Ashton instead of developing as a child herself and as a sibling to Ashton.  A.S. also could be harmed because her behavior prevented her from bonding with any foster parents.

While the section 366.26 hearing was ongoing from December 2012 to January 2014, the parents filed two petitions to change orders for reunification services and/or the return of the children pursuant to section 388.  Mother filed a motion for a bonding study.  The court denied both petitions and the motion.

The parents' respective section 388 petitions were filed in September 2013.  Both sought a modification of the court's orders denying reunification services and directing out-of-home placement and adoption.  The parents' contention was that the reasons for the children's removal no longer existed, and a child should always be with his or her parent.  The parents contended circumstances had changed because mother had secured safe and stable housing for the family using her newly acquired Social Security payments, both parents were receiving treatment for their mental health issues, and both parents were committed to their recovery from their methamphetamine addictions.  The parents also asserted the modification would benefit the children because they had "maintained an ongoing relationship" and had "a strong, loving bond."  Mother also contended reunification was in the children's best interest because she and father had acquired specialized parenting skills to cope with A.S.'s behavioral issues and they were sensitive to their children's special emotional and psychological needs.  The parents' petitions were opposed by the Department and the minors' counsel as untimely and failing to show either changed circumstances or that the changes would be in the children's best interest.

The court granted the parents an evidentiary hearing on the section 388 petitions and mother's motion at which the parents testified and presented testimony from third parties about the parents' recovery efforts and mental health treatments. After the contested hearing, the juvenile court denied the petitions as untimely because they were filed after the section 366.26 hearing had begun. The court reconsidered sua sponte its provision of an evidentiary hearing, finding the parents did not make a prima facie showing of changed as opposed to changing circumstances, or that the proposed modifications would be in the children's best interest. The court further found the parents did not prove changed circumstances or best interest of the children by either a preponderance of the evidence or clear and convincing evidence.

Mother requested a bonding study "to assist the Court in determining the appropriate permanency plan for" A.S. and Ashton. The parents contended they had a "strong" relationship with the children, as evidenced by their consistent visitation, and the children were strongly bonded to each other, having lived together all of Ashton's life. The parents also raised the same arguments they made with respect to their section 388 petitions: namely, they had engaged in therapy for their mental illnesses and had undertaken significant steps toward recovery with respect to their substance abuse. Mother also argued the court did not have before it any direct evidence about the children's feelings regarding their separation or Ashton's adoption -- at that time, no adoptive placement had yet been found for A.S. The court denied the motion as: (1) untimely, filed in late December 2013, because it would require a further continuance of the section 366.26 hearing, and (2) unnecessary because there was extensive evidence of the relationship between the siblings and between the parents and children from the visitation logs and assessments from the instant matter and the Wyoming matters, such that a bonding study would not aid it in its determination whether a beneficial relationship exception to the termination of parental rights applied.

7

## DISCUSSION

## I

### *Adoptability*

The parents contend there was insufficient evidence to support the juvenile court's finding A.S. was adoptable. We conclude there is substantial evidence of A.S.'s adoptability.

"If the court determines, based on the assessment . . . and any other relevant evidence, by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption. The fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted." (§ 366.26, subd. (c)(1).) We review the juvenile court's order to " ' "determine whether the record contains substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that [the child] was likely to be adopted within a reasonable time. [Citations.]" We give the court's finding of adoptability the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of affirming. [Citation.]' [Citation.]" (*In re I.I.* (2008) 168 Cal.App.4th 857, 869.)

The determination whether a child is adoptable "focuses on the *minor*, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.] Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed parent 'waiting in the wings.' [Citations.]" (*In re Sarah M*. (1994) 22 Cal.App.4th 1642, 1649.) However, the fact a prospective adoptive family is willing to adopt the minor is evidence the minor is likely to be adopted by that family or some other family in a reasonable time. (*In re Lukas B*. (2000) 79 Cal.App.4th 1145, 1154.) Essentially, by expressing an interest in adopting a minor, the prospective adoptive parent provides evidence " 'that the minor's

8

age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor.' " (*In re Asia L.* (2003) 107 Cal.App.4th 498, 510; see also *In re I.I., supra,* 168 Cal.App.4th at pp. 870-871 [noting the identification of a prospective adoptive placement may outweigh a child's negative characteristics for purposes of finding adoptability].)

Here, though the identification of an adoptive placement for A.S. arose late in the proceedings and she was noted to have some emotional, mental, and behavioral issues, there was substantial evidence for the juvenile court to conclude she was adoptable. Indeed, A.S. had successful conversations and visits, including an overnight weekend visit, with the home-study approved potential adoptive family that indicated an interest in adopting her. A.S. also had positive characteristics that supported a finding of adoptability -- she was described as physically healthy, on-target developmentally, creative, and smart. Thus, we conclude the juvenile court's finding of adoptability is supported by substantial evidence.

## II

### *Exceptions to the Termination of Parental Rights*

The parents contend the juvenile court erred in terminating their parental rights because: (1) the parents visited the children regularly and the children had a positive emotional attachment to the parents, indicating the application of the parent-child relationship exception; and (2) the sibling relationship exception applied because the benefits of that relationship outweighed the benefits of adoption.

Reviewing for substantial evidence (*In re Derek W.* (1999) 73 Cal.App.4th 823, 825, 827), we affirm the juvenile court's finding the parents did not establish a statutory exception to the termination of parental rights.

At the section 366.26 hearing, the juvenile court is required to select and implement one of four possible permanent plans for the children. The permanent plan preferred by the Legislature is adoption. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411.)

9

If a child is likely to be adopted, the court is directed to terminate parental rights and order the child placed for adoption. (§ 366.26, subd. (c)(1).) However, where "[t]he court finds a compelling reason for determining that termination would be detrimental to the child," such as where the sibling relationship or parent-child relationship exception applies, the court may avoid termination of parental rights. (§ 366.26, subd. (c)(1)(B)(i), (v).) The parents had the burden to show one of these statutory exceptions applied. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826.) We review the evidence in the light most favorable to the prevailing party and indulge all legitimate and reasonable inferences to uphold the court's rulings. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

## A.

### *Parent-Child Relationship*

Termination of parental rights may be detrimental to the minor when: "The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) There was no dispute the parents maintained regular visitation and contact with the children. Nonetheless, the juvenile court found the exception did not apply. Though the parents and children appeared to have a positive relationship, it did not appear the children regarded them in a parental role or sought guidance from them. Nor did the benefit of maintaining the parent-child relationship outweigh the benefit the children would receive through adoption.

For the exception to apply, the benefit to the child must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial positive

10

emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent[s'] rights are not terminated." (*In re Autumn H. , supra,* 27 Cal.App.4th at p. 575.) However, even frequent and loving contact is not sufficient to establish this benefit absent a significant positive emotional attachment between parent and child. (*In re Beatrice M., supra,* 29 Cal.App.4th at pp. 1418-1419; *In re Teneka W.* (1995) 37 Cal.App.4th 721, 728-729; *In re Brian R.* (1991) 2 Cal.App.4th 904, 924.)

Here, A.S. was 10 years old at the time the court terminated parental rights, and she had cumulatively spent more than four of those years in foster placements due to the parents' repeated substance abuse. Similarly, Ashton had spent one and a half of his first five years in foster care. Despite the children's removal from their care in May 2012, the parents waited until February 2013 to find accommodations and to commit to treating their substance abuse and mental health issues. Ashton had developed a "strong relationship" with his foster family, and was "happy," "settled and comfortable" in his foster placement. The state adoptions specialist felt moving him "would be difficult for him and detrimental to the progress he ha[d] made in his emotional health," and Ashton did not talk about his parents following his visits. A.S., who was old enough to understand the concept of adoption, was "done" with her parents, wanted a place where she "belong[s]," and was excited to be adopted by her prospective adoptive family. Moreover, the social workers who assessed the children opined that maintaining the parent-child relationship did not outweigh the benefits of stability and permanency offered by adoption. Thus, the record provides sufficient evidence to substantiate the juvenile court's finding the parent-child relationship exception does not apply.

**B.**

### Sibling Relationship

A second circumstance under which termination of parental rights would be detrimental is when "[t]here would be substantial interference with a child's sibling

relationship, taking into consideration the nature and extent of the relationship, including but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).) "To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child. Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended. If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952.) In making this inquiry, the court must consider the interests of the adoptive child, not the siblings. (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 812; *In re Celine R.* (2003) 31 Cal.4th 45, 49-50.)

Here, though Ashton and A.S. had been constant companions, living together since Ashton's birth, the record indicates their relationship was not emotionally healthy for either of them or in their best interest. A.S. was excessively parentified, and that parentification caused her to express her emotional energy by controlling Ashton instead of being a child herself. Ashton's response to A.S.'s parentified behavior was to become quiet, shy, withdrawn, and "emotionally shut down" in her presence. The record indicates and the lengthy search for a sibling group adoptive placement reflects the social worker's attempts to maintain the sibling relationship. After considering particularly Ashton's welfare and best interest -- namely, the concern about moving him to yet another placement given his attachment to his foster family -- the social worker opined it would be in both children's best interest for them to be adopted separately. The record provides substantial evidence to support the juvenile court's conclusion the sibling relationship exception does not apply here to prevent a termination of parental rights.

12

## III

### *Section 388 Petitions*

The parents contend the juvenile court erred in denying their section 388 petitions to return the children and/or institute reunification services (1) as untimely, (2) in failing to demonstrate (either prima facie or by a preponderance or clear and convincing evidence) changed circumstances, or (3) that the proposed modifications would be in the children's best interest. We conclude the petitions were timely. Even if we assume the parents made a prima facie showing of changed circumstances, we conclude the parents did not make a prima facie showing the initiation of reunification services or returning the children to the parents would be in the children's best interest. Therefore, we affirm the denial of the parents' section 388 petitions.

### A.

### *Timeliness of Section 388 Petitions*

The Department cites, and the trial court relied on, *In re Marilyn H*. (1993) 5 Cal.4th 295 to contend the modification petitions were untimely. In that case, a mother sought the return of her children at a section 366.26 hearing without filing a section 388 petition. (*In re Marilyn H*. at p. 299.) The Supreme Court concluded it was not a violation of the parent's due process rights to require her to file a section 388 petition prior to the termination of the reunification time period instead of permitting her to orally request a change of the court's prior order at the section 366.26 hearing after the reunification time period had lapsed. (*In re Marilyn H*. at pp. 309-310.) We find *In re Marilyn H*. to be factually inapposite to the present matter, where the parents filed section 388 petitions prior to the court issuing an order terminating parental rights, even if the petitions were filed after the section 366.26 hearing had commenced.

Section 388 provides that a parent may petition for modification of an order denying reunification services or removing a child from the parent's custody "prior to an

13

order terminating parental rights."[4]  (§ 388, subd. (a)(1) & (2).)  We review questions of statutory interpretation independently, seeking to ascertain the Legislature's intent, and in that review "[w]e begin with the statute's plain language, as the words the Legislature chose to enact are the most reliable indicator of its intent."  (*In re Corrine W.* (2009) 45 Cal.4th 522, 529.)  Here, though the section 366.26 hearing began several months prior to the filing of the parents' section 388 petitions in September 2013, the juvenile court did not issue an order terminating parental rights until January 27, 2014.  Thus, on the facts before us, the petitions are timely.

## B.

### *The Parents Did Not Meet their Evidentiary Burden*

To be entitled to an evidentiary hearing on a section 388 petition, a parent must make a prima facie showing of changed circumstances and that "the best interests of the child may be promoted by the proposed change in order."  (§ 388; see *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1036; *In re Daijah T.* (2000) 83 Cal.App.4th 666, 672-673; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; *In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1414; Cal. Rules of Court, rule 5.570(e)(1).)  More than general conclusory allegations are required to make this showing even when the petition is liberally construed.  (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593.)  "The prima facie requirement is not met unless the facts alleged, if supported by evidence . . . would sustain a favorable decision on the petition."  (*In re Zachary G.*, *supra*, 77 Cal.App.4th at p. 806.)  "In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case."  (*In re Jackson W.*

---

[4]    The juvenile court relied on subdivision (c)(3) of section 388 to find the petitions untimely.  However, the temporal limitation codified therein, which requires petitions to terminate reunification services be made prior to the selection and implementation hearing, is inapplicable to the parents' petitions, which sought an initiation of reunification services, not their termination.  (§ 388, subd. (c)(1) & (3).)

14

(2010) 184 Cal.App.4th 247, 258.) We review the denial of a petition to modify for abuse of discretion; absent a showing of a clear abuse of discretion, the decision of the juvenile court must be upheld. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319; *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)

As the juvenile court found the parents did not show both changed circumstances and that the modifications would be in the children's best interest, we review the parents' allegations in their petitions to determine whether they made prima facie showings for both elements. With respect to changed circumstances, mother alleged she "is receiving therapy for mental health issues," "is committed to taking her medication as prescribed," "is committed to continuing in therapy, attending support groups and parenting education classes," and "has become [an] active member of the recovery community." Father alleged "the reasons for removal of the children no longer exist," and more specifically alleged that since the court bypassed services, he has "decided to live a clean and sober life." He apparently contrasts this case with the prior occasions where A.S. was returned to their custody after they were able to overcome their addiction issues.

To demonstrate the proposed changes would be in the children's best interest, mother alleged as follows: "The mother has been engaging in services since May 2012. The mother has maintained an ongoing relationship with [A.S.] and Ashton and there is a strong, loving bond between her and her children. The mother is now receiving a monthly income of $629.74 (in addition to receipt of a substantial lump sum of $7,757.08) from Social Security from which she has secured safe and stable housing." Father alleged: "A child should always be with their parent as it is the child's right as well as the parent's right to have and parent their child assuming mentally, emotionally, and physically able to do so." Father further alleged A.S. and Ashton love him and his wife, he loves his children, and he and his wife have consistently visited the children. He would like to have his children returned to him or have services to prove his ability to care for the children in a drug-free home.

15

Even assuming the parents have made a prima facie showing of changed circumstances based on their sobriety since February 2013, which we do not decide, the parents' allegations do not make a prima facie showing reunification services or a return of the children to parents' care would be in the children's best interest. In the absence of that showing, the juvenile court could properly deny the petitions for modification without holding a hearing. (*In re Daijah T., supra,* 83 Cal.App.4th at pp. 672-673; *In re Zachary G., supra,* 77 Cal.App.4th at p. 806.) The best interests of the child are of paramount consideration when a section 388 petition is brought, as here, after termination of reunification services. (*In re Stephanie M., supra,* 7 Cal.4th at p. 317.) In assessing the best interests of the child, the juvenile court looks not to the parent's interests in reunification but to the needs of the child for permanence and stability. (*Ibid.*; *In re Marilyn H., supra,* 5 Cal.4th at p. 309.) The court may consider: "(1) the seriousness of the problems which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to both parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532.)

We find *In re Angel B.* (2002) 97 Cal.App.4th 454 instructive in this matter. There, the facts presented in the mother's section 388 petition showed "that Mother is doing well, in the sense that she has remained sober, completed various classes, obtained employment, and visited regularly with Angel." (*In re Angel B.* at pp. 464-465.) For purposes of the appeal, the court assumed the mother would be able to remain sober, employed, become self-supporting, and obtain housing. "Even so," the court concluded, those facts were not legally sufficient to require a hearing on the mother's section 388 petition because she made no factual showing the best interests of the child would be served by changing the court's order to give her custody or reunification services. (*In re Angel B.* at p. 465.)

16

Similarly, here, the parents do appear to be doing well. At the time of filing their petitions, they had maintained their sobriety for about seven months, mother had acquired a stable income and safe housing for the family, and both parents had visited with the children regularly. However, the juvenile court was also aware the parents had achieved temporary sobriety on at least two previous occasions when the Wyoming dependency court had removed A.S. from their care but relapsed both times. The parents did not indicate they made efforts to become sober or obtain treatment or housing until February 2013, two months after the section 366.26 hearing commenced and eight months after the children were removed from their care. The parents made only conclusory allegations that they and the children love each other. The parents made no allegations that returning the children to their care or providing them with reunification services, thereby delaying any adoption of the children, would serve the children's interest better than the stability and permanence they would obtain through adoption. The evidence showed Ashton was happy and attached to his foster family with whom he had been placed for more than a year. A.S., though difficult to place, had been deemed adoptable. We conclude these allegations do not make a factual showing the best interests of the minors would be served by modifying the juvenile court's orders to return the minors to the parents' custody or provide reunification services. Accordingly, the juvenile court did not err in denying the parents' petitions without an evidentiary hearing.[5]

---

[5]    Though the court held an evidentiary hearing on the petitions, it reconsidered its order granting that hearing sua sponte. One of the bases of its denial of the parents' section 388 petitions was that they did not make a prima facie showing of changed circumstances and best interest of the children to warrant a hearing.

## IV

### *Bonding Study*

The parents contend the juvenile court erred when it denied mother's request for a bonding study, which the parents allege would have aided the juvenile court in its determination of the relative benefits of the parent-child and sibling relationships. We conclude it was not an abuse of discretion for the juvenile court to deny mother's request for a bonding study in light of the extensive evidence of the parent-child and sibling relationships already before it.

A bonding study is an expert opinion on the relationship between the parent and child or between siblings. Such a study is not required prior to termination of parental rights. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339; *In re Richard C.* (1998) 68 Cal.App.4th 1191, 1195.) The juvenile court is never required to appoint an expert when making a factual determination -- here, the relative benefit of the parent-child or sibling relationship as compared to adoption -- unless "it appears to the court . . . that expert evidence is . . . required." (Evid. Code, § 730.) Thus, when there is extensive evidence in the record of the relationship between parent and child or between siblings, a bonding study is unnecessary. Absent a showing of clear abuse, the exercise of the court's discretion in granting or denying a request for a bonding study will not be overturned. (*In re Stephanie M.*, *supra,* 7 Cal.4th at pp. 318-319; *In re Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1341.)

Here, there were years of reports and logs of visitation from the instant matter and the Wyoming dependency proceedings to demonstrate both the parent-child and sibling relationships. Based on the record, it was not an abuse of discretion for the juvenile court to deny mother's request for a bonding study.

# V

## *Separate Counsel*

The parents contend the juvenile court prejudicially erred in not appointing separate counsel for the two children once the Department supported separation of the siblings for the foster family to adopt Ashton but not A.S. The parents contend the siblings' interests diverged at this point. Adoption of Ashton would require counsel to argue for termination of parental rights, whereas A.S. had no identified adoptive placement and had stated a preference to maintain a relationship with Ashton. We conclude these facts do not create an actual conflict of interest mandating appointment of separate counsel, and any error in failing to appoint separate counsel was harmless.

"[T]he court may appoint a single attorney to represent all of the siblings unless at the time of appointment an actual conflict of interest exists among them or it appears from the circumstances specific to the case that it is reasonably likely an actual conflict will arise. After the initial appointment, the court must relieve counsel from the joint representation when, but only when, an actual conflict of interest arises." (*In re Celine R., supra,* 31 Cal.4th at p. 50.) "For an actual conflict to arise at the permanency planning stage, there must be a showing that the siblings have different interests that would require their attorney to advocate a course of action for one child which has adverse consequences to the other. Standing alone, the fact that siblings have different permanent plans does not necessarily demonstrate an actual conflict of interest. [Citations.]" (*In re T.C., supra,* 191 Cal.App.4th at p. 1391.)

Here, the best interests of both siblings are the same: termination of parental rights and adoption as the permanent placement goal for each child. The separation of the sibling group in order to achieve stability and permanency through adoption did not create an actual conflict requiring separate counsel. As explained in *In re Celine R.*, the sibling relationship exception to the termination of parental rights contemplates consideration of the effect on the child being adopted and not the impact on the sibling of

19

that child. The court is specifically directed to consider the best interests of the adoptive child, not the siblings, and must ultimately determine whether adoption would be detrimental to the adoptive child, not the siblings. (*In re Celine R., supra,* 31 Cal.4th at p. 54.) Separate counsel is not required simply because a sibling wishes to maintain a relationship with a child who is to be adopted. These are the kinds of competing interests counsel and the courts deal with in virtually every permanency planning hearing involving siblings. (*In re T.C., supra,* 191 Cal.App.4th at p. 1392.) The court could only consider "whether [Ashton's] interest in maintaining the relationship with [A.S.] outweighed [his] interest in the stability and permanence [he] could receive in an adoptive home." (*Ibid.*) Advocating for Ashton's interest in adoption did not adversely affect A.S.'s interest in permanence and stability, whether ultimately through adoption or some other alternative. Consequently, there was no actual conflict between the two siblings' interests.

Moreover, even if separate counsel should have been appointed, we conclude any error was harmless because there is no reasonable probability the juvenile court would have selected different permanent plans. (*In re Celine R.*, *supra,* 31 Cal.4th at p. 60.) As noted above, there is evidence both Ashton and A.S. were adoptable and adoption was in their best interest. The court properly concluded neither the parent-child nor sibling relationship exception applied. On this record, even if separate counsel for the minors had been appointed, it is unlikely the court would have refrained from terminating parental rights.

# VI

## *Cumulative/Independent Prejudice*

The parents contend the alleged errors, whether taken separately or cumulatively, require reversal. Having found no error, we conclude there was no cumulate or independent prejudice meriting reversal.

20

DISPOSITION

The orders terminating parental rights are affirmed.

      HOCH     , J.

We concur:

      BLEASE     , Acting P. J.

      MAURO     , J.